433-04/PJG/

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
PORT ARTHUR INVESTMENTS S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)



'JUDGE CROTTY,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PORT ARTHUR INVESTMENTS S.A.,

**07 CV 2784**

Plaintiff,

- against --

**VERIFIED COMPLAINT**

NAVI-TREK INC. and GRAIN TRADERS &
CONSUMERS, INC.,

Defendants.

-------------------------------------------------------------x

Plaintiff, PORT ARTHUR INVESTMENTS S.A. (hereinafter "Plaintiff" and/or "Port Arthur"), by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against the Defendants NAVI-TREK INC. (hereinafter "Navi-Trek") and GRAIN TRADERS & CONSUMERS, INC. (hereinafter "Grain Traders"), alleges upon information and belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract(s) of charter party and bill(s) of lading. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and the Court's federal question

NYDOCS1/281119.1

jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.   At all times relevant hereto, the Plaintiff Port Arthur was and still is a foreign business entity duly organized and existing under the laws of Monrovia with an office and place of business in care of DND Management Inc., Esperides Bldg. 3, Esperidon Square, 16674 Glyfada, Athens, Greece.

3.   At all times relevant hereto, the Defendant Navi-Trek was and still is a business entity duly organized and existing under the laws of a foreign country with an office and place of business c/o Navi-Trek (Overseas) Inc., 732 Main Street, Houston TX 77002-3311 but no office or presence within this District.

4.   At all times relevant hereto, the Defendant Grain Traders was and still is a business entity duly organized and existing under the laws of the Philippines with a corporate address at 265 Old Panaderos Street, Stay. Ana, Manila, Philippines and a business address at 146 Valero Street, Pearlbank Centre, 22nd Floor, Salcedo Village, Makati City, Philippines but no office or presence within this District.

5.   On or about September 27, 2004, Plaintiff Port Arthur, in the capacity as owner of the M/V ANGELIKI D, an ocean-going vessel, entered into a maritime contract of charter party with Defendant Navi-Trek under which Defendant Navi-Trek agreed to charter the M/V ANGELIKI D for a period time charter trip of about 25-30 days for the carriage of bulk fertilizer. A copy of the subject charter party is annexed hereto as Exhibit A and incorporated herein by reference (hereinafter the "head charter party").

6.  By voyage charter party dated September 29, 2004, the Defendant Navi-Trek, as disponent owner, sub-chartered the subject vessel to a company by the name of Philippine Planters Consumers Inc. for the carriage contemplated under the charter party referred to in 5 above.   A copy of the sub-charter contract between Navi-Trek and Philippine Planters Consumers Inc. is attached hereto as Exhibit B and incorporated herein by reference (hereinafter the "sub-charter party").

7.  The head charter party provided, *inter alia*, that the Defendant Navi-Trek would trade the vessel "only always via safe port(s) safe berth(s) safe anchorage(s)", and further provided that the contract would be governed by and construed according to English Law and subject to arbitration in London.  (See. Ex. A hereto, at ¶1 and 44, respectively).

8.  The incorporation of a safe berth and safe port clause, as outlined in paragraph 7 above, constitutes a warranty under English law that the port(s) to which the vessel trades shall be one which the vessel can reach, use and return from without, in the absence of some abnormal occurrence, being exposed to danger.

9.  The terms of the sub-charter party included a similar safe berth warranty (see Exhibit B at Box 11).

10.  Pursuant to the terms of the head charter party, Plaintiff Port Arthur duly tendered the M/V ANGELIKI D into the service of Navi-Trek in September, 2004 and the vessel commenced trading under the subject head charter, and then the sub-charter.

11.  Pursuant to Navi-Trek's instructions the vessel berthed at Quinhuangdao, and later at Longkou where a cargo of urea in bulk was loaded.

12. After the completion of loading at the two load ports, bills of lading were issued which incorporated all the terms and conditions of the sub-charter.

13. Upon arrival at the designated discharge port, the berth was determined not to be a safe place for the subject vessel to discharge the cargo which constituted a breach of the terms of the head charter.

14. The unsafe berth condition also constituted a breach of the sub-charter party and the bills of lading (the latter of which incorporated by reference all the terms and conditions of the sub-charter party), as, pursuant to Singapore law, the incorporation via bills of lading of a charter party with a safe berth warranty inures to the benefit of the owner of the carrying vessel and on whose behalf the bills of lading were issued.

15. As a consequence of the foregoing, there was a delay in the vessel's berthing and eventual discharge of the cargo, during which the Defendant Navi-Trek wrongfully placed the vessel off-hire under the head charter party.

16. In addition, the Defendant Grain Traders commenced an action in the Philippines and caused the vessel to be arrested to obtain security for alleged damages in the way of costs and extra expenses allegedly incurred as a consequence of the delay.

17. The commencement and maintenance of this action in the Philippines by the Defendant Grain Traders constituted a further breach of the terms of the applicable contracts (including the bills of lading and the incorporated sub-charter party) which provided for arbitration of any disputes in Singapore.

18. So as to avoid any further delay to the vessel, the Plaintiff Port Arthur arranged for the posting of security in the Philippines in the sum of $273,358.62 to allow the vessel to sail.

19. In addition, and in view of Defendant Grain Traders' refusal to abide by the provisions in the contracts calling for Singapore arbitration of any dispute under the bills of lading and/or sub-charter, Plaintiff Port Arthur commenced proceedings in Singapore, seeking, *inter alia,* a declaratory judgment that any disputes must be settled in Singapore and for damages.

20. As a consequence of the foregoing, Plaintiff Port Arthur has a claim against the head charterer Navi-Trek for breach of the head charter party in failing to nominate a safe berth, and has suffered damages consisting of: (i) hire wrongfully deducted by Navi-Trek in the sum of $219,843.62; (ii) the $273,358.62 which Port Arthur had to post as security in the Philippine action; (iii) costs and fees incurred in the Philippine action, and in the Singapore action in respect to the unsafe berth situation and the defense and prosecution of the actions in the Philippines and in Singapore, in the sum of $211,384, and thus at present has a claim for $704,586.24.

21. As outlined above, the head charter party provides that it is to be governed by English law and all disputes between the parties are to be resolved by arbitration in London, and Plaintiff Port Arthur specifically reserves its right to arbitrate the substantive matters at issue.

22. This action is brought in aid of the London arbitration against Defendant Navi-Trek to obtain security for the claims and for the additional sums which Plaintiff will incur in the way of anticipated attorney's fees and arbitral costs in the arbitrations and litigations, plus interest, all of which are recoverable as part of Plaintiff's claim under English law, and which are estimated, as nearly as can be computed at $456,000.

23. As a consequence of the foregoing, Plaintiff Port Arthur also has a separate claim against Defendant Grain Traders for breach of the terms of the applicable bills of lading and

incorporated sub-charter by virtue of the unsafe condition of the discharge berth and for commencing and prosecuting the Philippine action under circumstances where the contract(s) provide for Singapore arbitration, which claims include: (i) the loss of the hire for the period the vessel was detained at the discharge port in the sum of $219,843; (ii) the $273,358.62 which Port Arthur had to post as security in the Philippine action; (iii) the costs and fees incurred in the Philippine action and in the Singapore action in respect to the unsafe berth situation and the defense and prosecution of the actions in the Philippines and in Singapore, in the sum of $211,384, for a total claim at present of $704,586.24.

24. As outlined above, the sub-charter party and the incorporated bills of lading provide for disputes to be resolved in Singapore arbitration, and Plaintiff Port Arthur specifically reserves its right to arbitrate the substantive matters at issue in that forum.

25. This action is brought in aid of the Singapore arbitration proceedings to obtain security for the claims and for the additional sums which Plaintiff will incur in the way of anticipated attorney fees and arbitral costs in the arbitration and the further defense of he Philippine action, together with interest, all of which are recoverable as part of Plaintiff's claim under Singapore law and which are estimated, as nearly as can be computed, at $411,000.

26. Upon information and belief, and after investigation, Defendants Navi-Trek and Grain Traders cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (hereinafter, "ASSETS"), at, moving through banking institutions including but not

limited to ABN Amro, American Express Bank, Atlantic Bank of New York, BNP Paribas, Bank of America, Bank of China, Bangkok Bank Public Co., Ltd., Bank of Tokyo-Mitsubishi, Ltd., Calyon Corporate & Investment Bank, Credit Lyonnais, Credit Agricole Group,  Calyon, Calyon Credit Lyonnais New York, Calyon New York, Citibank, Deutsche Bank, HSBC, HSBC USA Bank NA,  JP Morgan Chase Bank, Societe Generale, Standard Chartered Bank, The Bank of New York, Wachovia Bankand/or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein, with the total amount to be attached being (a) $1,160,586.20 in respect to the claim against Defendant Navi-Trek; and (b) $1,115,586.20 in respect to the claim against Defendant Grain Traders.

WHEREFORE, Plaintiff Port Arthur prays:

a.    That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged;

b.    That since Defendants cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant Navi-Trek, up to and including the sum of $1,160,586.20 and all tangible or intangible property of the Defendant Grain Traders, up to and including the sum of $1,115,586.20 be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, debts, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of the said Defendants (as identified herein) moving through or within the banking institutions and/or any other institutions or

any garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.     That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary, including enforcement of the award and entry of judgment thereon; and,

d.     For such other, further and different relief as this Court may deem just and proper in the premises.

Dated:  New York, New York
        April 4, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
        Peter J. Gutowski (PG 2200)
        80 Pine Street
        New York, NY  10005
        (212) 425-1900
        (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client through their English and Greek solicitors.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
              Peter J. Gutowski

Sworn to before me this
5th day of April, 2007

_____
        Notary Public

**JOAN SORRENTINO**
Notary Public, State of New York
No. 01SO6067227
Qualified in New York County
Commission Expires December 3, 2009





# TIME CHARTER
### New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

*November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;*
*Revised June 12th, 1981; September 14th, 1993.*

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in Piraeus.................................................... | 1 |
| This ......27th .................. Day of .........September ...... 19...2004......................................... | 2 |
| | |
| Between ... Port Arthur Investments S.A , 80 Broad Street, Monrovia / Liberia as Owner | 3 |
| ................................................................................................................................. | 4 |
| Owners of the Vessel described below, and ...Navi-Trek Inc., Houston, USA................................. | 5 |
| ................................................................................................................................. | 6 |
| ................................................................................................................................. | 7 |
| Charterers. | 8 |
| | |
| Description of Vessel | 9 |
| | |
| Name ...ANGELIKI D. Flag ......Panama ..............Built ........1979.................................(year) | 10 |
| Port and number of Registry ............................................................................................ | 11 |
| Classed .............................. in .......................................................................... | 12 |
| Deadweight ...................................... long*/metric* tons (cargo and bunkers, including freshwater and | 13 |
| stores not exceeding ................ long*/metric* tons) on a salt water draft of ................................. | 14 |
| on summer freeboard. | 15 |
| Capacity .......................... cubic feet grain ...................................... cubic feet bale space. | 16 |
| Tonnage ...................................... GT/GRT. | 17 |
| Speed about .......................... knots, fully laden, in good weather and smooth sea conditions up to and | 18 |
| including maximum | |
| Force ......... on the Beaufort wind scale, on a consumption of about .......................... long*/metric* | 19 |
| Tons of ...................................... | 20 |
| | |
| * Delete as appropriate. | 21 |
| For further description see Appendix "A" (if applicable) | 22 |
| | |
| 1.   Duration | 23 |
| | |
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| of timecharter trips with harmless Bulk fertilizers only always via safe port(s) safe berth(s) safe anchorage(s) | 25 |
| always afloat always within institute warranty limits. | 26 |
| ................................................................................................................................. | 27 |
| Duration is about 25 /30 days without guarantee within below mentioned trading limits. | 28 |
| | |
| | 29 |







Annex 1

EXHIBIT A

The Vessel shall be placed at the disposal of the Charterers at dropping outwards sea pilot Rizhao
30

ATDNSHINC. ................................................................................................ 31

.................................................................................................................. 32

.......................................................................... The Vessel on her delivery 33

shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted 34

for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35

simultaneously. 36

The Owners shall give the Charterers not less than ........3/2/1............ days notice of expected date of 37

delivery. 38

3.  On-Off Hire Survey 39

On-hire bunker survey and off-hire bunker survey to be carried out at the 1st loading port and respectively at
the last discharging port. The appointment of bunker surveyor to be agreed to by both Owners and Charterers
and cost/time of same to be shared equally. On hire survey to be on Charterers time and off hire survey on
Owners time. But owners have the right to appoint Master or Chief Engineer as their surveyor in which case
charterers appointed surveyor fees to be for charterers' account.

Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their 40

respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct 41

joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition 42

of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without 43

prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree. 44

If either party fails to have a representative attend the survey and sign the joint survey report, such party 45

shall nevertheless be bound for all purposes by the findings in any report prepared by the other party. 46

On-hire survey shall be on Charterers' time and off-hire survey on Owners' time. 47

4.  Dangerous Cargo/Cargo Exclusions – See Clause 74 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, 49

injurious, flammable or corrosive nature unless carried in accordance with the requirements or 50

recommendations of the competent authorities of the country of the Vessel's registry and of ports of 51

shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must 52

pass. Without prejudice to the generality of the foregoing, in addition the following are specifically 53

excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials; 54

.................................................................................................................. 55

.................................................................................................................. 56

.................................................................................................................. 57

.................................................................................................................. 58

.................................................................................................................. 59

.................................................................................................................. 60

.................................................................................................................. 61

.................................................................................................................. 62

.................................................................................................................. 63





....................................................................................................    64

~~(b) If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~    65
~~................................... tons and the Charterers shall provide the Master with any evidence he may~~    66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~    67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~    68
~~the Charterers' risk and expense.~~    69

**5.   Trading Limits** – See Clause 75    70

~~The Vessel shall be employed in such lawful trades between safe ports and safe places~~    71
~~within~~ ......................................................................................................    72
............................................................................................ ~~excluding~~    73
....................................................................................................    74
....................................................................................................    75
.......................................................................... ~~as the Charterers shall direct.~~    76

**6.   Owners to Provide**    77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for    79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and    81
equipment for and during the service, and have a full complement of officers and crew with all certificates    82
necessary to comply with requirements at ports of call for and during service.

**7.   Charterers to Provide**    83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise    84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory    85
garbage removal and disposal), ~~all communication expenses pertaining to the Charteres' business at cost,~~    86
customary pilotages, and pilotages which master deemed necessary for safe manoeuvring i.e. due to
bad weather and/or shallow /narrow waters as long as it is understood that master's request not
to be unreasonable,  and canal dues and boat age on Charterers' business,
towages, agencies, commissions, seaways , river tolls consular charges (except those pertaining to    87
individual crew members
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel    88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners.  Fumigations ordered because of illness of the crew    90
shall be for the Owners' account.  Fumigations ordered because of cargoes carried or ports visited while    91
the Vessel is employed under this Charter Party shall be for the Charterers' account.  All other fumigations    92
shall be for the Charterers' account after the Vessel has been on charter for a continuos period of six    93
months or more.    94

The Charterers shall provide and pay for necessary dunnage lashing materials, and also any extra fittings     95
requisite for a
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard     96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in     97
their time.     98

8.   Performance of Voyages     99

(a)  The Master shall perform the voyages with due despatch, and shall render all customary assistance     100
with the Vessel's crew and boats.  The Master shall be conversant with the English language and (although     101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards     102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to     103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk     104
and expense, under the supervision of the Master.     105

(b)  If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or     106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if     107
necessary, make a change in the appointments.     108

9.   Bunkers -- See Clause 81     109

(a)  The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and     110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with     111
.......................................... long*/metric* tons of fuel oil at the price of ..................... per ton;     112
.............................. tons of diesel oil at the price of ...................... per ton. The vessel shall     113
be redelivered with ............................... tons of fuel oil at the price of ........................... per ton;     114
............................... tons of diesel oil at the price of ...................................... per ton;     115

* Same tons apply throughout this clause     116

(b)  The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and     117
auxiliaries and which conform to the specification(s) as set out in Appendix A.     118

The Owners reserve their right to make a claim against the Charterers for an damage to the main engines     119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed     120
specification(s).  Additionally, if bunker fuels supplied do not conform with the mutually agreed     121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners     122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker     123
consumption, nor for any time lost and any other consequences,.     124

10.   Rate of Hire/Redelivery Areas and Notices     125

The Charterers shall pay for the use and hire of the said Vessel at the rate of 18,500 USD PDPR     126
including overtime every 15 days in advance upon delivery into owners nominated bank in Piraeus with

swift copy to owners fax or email

| | |
|---|---|
| U.S. currency, daily, or $ ................................................ U.S. currency per ton on the Vessel's total deadweight | 127 |
| carrying capacity, including bunkers and stores, on ............................... summer freeboard, per 30 days; | 128 |
| commencing on and from the day time of her delivery, as aforesaid, and at and after the same rate for any part | 129 |
| of a daytime month: hire shall continue until the hour of the day of her redelivery in like good order and | 130 |
| condition, | |
| ordinary wear and tear excepted, to the Owners (unless Vessel lost) at on dropping last outward sea pilot | 131 |
| East MALAYSIA – Philippines range in charterers option any time day or night Sundays holidays | 134 |
| included unless otherwise mutually agreed. | |

| | |
|---|---|
| The Charterers shall give the Owners not less than ........................... days notice of the Vessel's | 135 |
| expected date and probable port of redelivery. their intention to redeliver the Vessel and expected redelivery | 136 |
| range, then to give 15/10 days approximate notice of probable port and date of redelivery, with 6/3/2/1 | |
| days definite notice of redelivery date of vessel. | |

| | |
|---|---|
| For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be | 137 |
| adjusted to GMT. | 138 |

| | |
|---|---|
| 11.   Hire Payment | 139 |

| | |
|---|---|
| (a)   Payment | 140 |

| | |
|---|---|
| Payment of Hire shall be made so as to be received by the Owners or their designated payee in | 141 |
| EFG EUROBANK ERGASIAS S.A. | 142 |
| Athens, Greece | |

| | | |
|---|---|---|
| Account No. | 0026.0029.21.1200169941 | 143 |
| Swift No. | EFGBGRAA | |
| IBAN No. | GR 74026.0029.0000.21.1200169941 | |
| Beneficiary | Port Arthur Investments S.A. | 144 |

REFERENCE     m/v ANGELIKI D

| | |
|---|---|
| ............................................................................................. in | 145 |
| ........................................................ currency, or in United States Currency, in funds available to the | 146 |
| Owners on the due date, every 15 days in advance, and for the last month 15 days or part of same the approximate | 147 |
| amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day | 148 |
| as it becomes due, if so required by the Owners.  Failing the punctual and regular payment of the hire, | 149 |
| or on any fundamental breach whatsoever of this charter Party, the Owners shall be at liberty to | 150 |
| withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) | 151 |
| may otherwise have on the Charterers. | 152 |

| | |
|---|---|
| At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the | 153 |
| hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold | 154 |



the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever 155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire 156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the 157
Charterers' account. 158

(b)   Grace Period 159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors 160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 161
......3... clear banking days (as recognized at the agreed place of payment) written notice to rectify the 162
failure, and when so rectified within those ......3..... days following the Owners' notice, the payment shall 163
stand as regular and punctual. 164

Failure by the Charterers to pay the hire within ......3........ days of their receiving the Owners' notice as 165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (b) above. 166

(c)   Last Hire Payment 167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate 168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and 169
the Charterers may estimate agree upon as being the estimated time necessary to complete the voyage, after 170
obtaining from agents vessel's discharging/completion prospects and taking
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for 171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the 172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be 173
refunded by the Owners or paid by the Charterers, as the case may be 174

(d)   Cash Advances 175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required 176
by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire. 177
The Charterers, however, shall in no way be responsible for the application of such advances. 178

12.   Berths 179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place or safe 180
anchorage that
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat 181
at any time of tide. 182

13.   Spaces Available 183

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can 184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the 185

Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,    186
apparel, furniture, provisions, stores and fuel.    187

~~(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the~~    188
~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~    189
~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~    190

14.   Supercargo and Meals    191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'    192
risk and see that voyages are performed with due despatch. He is to be furnished with free    193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of    194
.........US$15.00....... per day.  The Owners shall victual pilots and customs officers, and also, when    195
~~authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,~~    196
Charterers paying at the rate of US$1300.00 per meal for all such victualling and cable/communication    197
expenses, meals and representations (See Clause 79).  Payable per month pro rata.

15.   Sailing Orders and Logs    198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing    199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine    200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the    201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,    202
showing the course of the Vessel, distance run and the consumption of bunkers.  Any log extracts    203
required by the Charterers shall be in the English language.    204

16.   Delivery/Cancelling    205

If required by the Charterers, time shall not commence before    00:01H 28 Sep 2004    and should the    206
Vessel not be ready for delivery on or before 30 September 2004 but not later than  24:00  hours,    207
the Charterers shall have the option of cancelling this Charter Party upon final notice of readiness for    208
delivery into this charter being given, provided it is clear that vessel will miss the cancelling.

~~Extension of Cancelling~~    209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~    210
~~for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~    211
~~the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~    212
~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~    213
~~cancel the Charter Party.  Should the Charterers elect not to cancel, or should they fail to reply within two~~    214
~~days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date~~    215
~~of readiness for delivery as notified by the Owners shall replace the original cancelling date.  Should the~~    216
~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~    217
~~in accordance with this Clause.~~    218

17.  Off Hire                                                                                                    219

In the event of loss of time from efficiency and/or default and/or strike of officers or crew, or deficiency          220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the               221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,              222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless           223
resulting from inherent vice, quality or defect of the cargo, dry-docking for the purpose of examination or          224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of             225
hire and overtime, if any, unless same caused by charterers or their agents or servants shall cease                  226
for the time thereby lost.  Should the Vessel deviate or put back
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident          227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time             228
of her deviating or putting back until she is again in the same or equidistant position from the destination         229
and the voyage resumed therefrom.  All bunkers used by the Vessel while off hire shall be for the Owners'            230
account.  In the event of the Vessel being driven into port or to anchorage through stress of weather,               231
trading to shallow harbours or to rivers or ports with bars, any detention of the Vessel and/or expenses             232
resulting from such detention shall be for the Charterers' account.  If upon the voyage the speed be                 233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and           234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be                  235
deducted from the hire.                                                                                              236

18.  Sublet                                                                                                         237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of           238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfilment of this             239
Charter Party.                                                                                                      240

19.  Drydocking                                                                                                     241

The Vessel was last drydocked ............................................................................          242

* (a)  The Owners shall have the option to place the Vessel in drydock during the currency of this Charter           243
at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for                244
bottom cleaning and painting and/or repair as required by class or dictated by circumstances.                        245

* (b)  Except in case of emergency no drydocking shall take place during the currency of this Charter                246
Party.                                                                                                              247

* Delete as appropriate                                                                                             248

20.  Total Loss                                                                                                     249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or                  250

being last heard of) shall be returned to the Charterers at once.                                        251

21.  Exceptions                                                                                          252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the    253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always       254
mutually excepted.                                                                                       255

22.  Liberties                                                                                           256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels      257
in distress, and to deviate for the purpose of saving life and property.                                  258

23.  Liens                                                                                               259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due           260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on        261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be          262
returned at once.                                                                                        263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,       264
which might have priority over the title and interest of the Owners in the Vessel.  The Charterers               265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries         266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.         267

24.  Salvage                                                                                             268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting             269
Owners' and Charterers' expenses and crew's proportion.                                                   270

25.  General Average                                                                                     271

General average shall be adjusted/stated according to York-Antwerp Rules 1974, as amended 1990, or any           272
subsequent modification thereof, in ......London...... and settled in ....United States Dollars......            273
currency.                                                                                                274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will       275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules          276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason                    277
Clause" as per Clause 31.                                                                                278

.............hire shall not contribute to general average.                                               279

26.  Navigation                                                                                          280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners          281
shall remain responsible for the navigation of the Vessel, acts of licensed pilots and tug boats, insurance, crew,    282
and all other matters, same as when trading for their own account.          283

27.  Cargo Claims          284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club          285
New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent          286
modification or replacement thereof.          287

28.  Cargo Gear and Lights          288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows: 5 cranes of 20          289
metric tons............................................................................................          290
..........................................................................................................          291
..........................................................................................................          292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also          293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall          294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If          295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the          296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or          297
insufficient power to operate the same, the Vessel is to be considered to be off hire pro rata to the          298
number of deficient cranes, versus cranes in working order and to the extent that
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned          299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If          300
required by the Charterers, the Owners shall bear the cost of hiring comparable shore gear in lieu thereof,          301
suitable for Charterers' requirements, in which
case the Vessel shall remain on hire.          302

29.  Crew Overtime          303

In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,          304
the Charterers shall pay the Owners, concurrently with the hire .................................... per month          305
or pro-rata.          306

30.  Bills of Lading          307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates          308
or tally-clerk's receipts. However, the Charterers may and/or their agents are hereby authorised to          309
sign bills of lading or waybills on behalf of the
Master with the Owner's prior written authority, always strictly in conformity with mates receipts or tally-clerk's          310
receipts. No Liner or through Bills of Lading to be issued under this c/p.



(b) All Bills of lading ~~or waybills~~ shall be without prejudice to this Charter Party and the Charterers shall     311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency     312
between this Charter Party and any bills of lading ~~or waybills~~ signed by the Charterers or by the Master     313
at their request.     314

~~(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and~~     315
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for~~     316
~~any loss, damage, expense or delay howsoever caused."~~     317

31.  Protective Clauses     318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of     319
lading ~~or waybills~~ issued hereunder:     320

(a)  CLAUSE PARAMOUNT     321
"The bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the     322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national     323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall     324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the     325
carrier any of its rights or immunities or an increase of any of its responsibilities or liabilities under said     326
applicable Act.  If any term of this bill of lading be repugnant to said applicable Act to any extent, such     327
term shall be void to that extent, but no further."     328

and     329

(b)  BOTH-TO-BLAME COLLISION CLAUSE     330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any     331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in     332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against     333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents     334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other     335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the     336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.     337
The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or     338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or     339
contact."     340

and     341

(C)  NEW JASON CLAUSE     342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage     343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the     344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,     345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the     346

payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    347
and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    352

and    353

(d)  U.S. TRADE - DRUG CLAUSE    354
"In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986 or any re-enactment thereof, the    355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences    358
of which the Charterers   shall be liable and shall hold the Owners, the Master and the crew of the Vessel    359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360
against them individually or jointly.  Furthermore, all time lost and all expenses incurred, including fines,    361
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account    362
and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    364
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    368
Vessel's personnel."    369

and    370

(e)   WAR CLAUSES    371
"(i)  No contraband of war shall be shipped.  The Vessel shall not be required, without the consent of the    372
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state    373
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration    374
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,    375
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de    376
facto authority or any purported governmental organization maintaining naval, military or air forces);    377

(ii)  If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring    378
Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not    379
exceeding a valuation of ...................................................  In addition, the Owners may purchase and the    380
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,    381

~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ | 382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ | 383

~~(iii) In the event of the existence of the conditions described in (I) subsequent to the date of this Charter,~~ | 384
~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~ | 385
~~port or zone assume the probable additional cost of wages and insurance properly incurred in connection~~ | 386
~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ | 387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ | 388
~~Charterers' account."~~ | 389

32. <u>War Cancellation</u> | 390

~~In the event of the outbreak of war (whether there be a declaration of war or not) between any two or~~ | 391
~~more of the following countries ...........................................................................................................~~ | 392
~~................................................................................................................................................................~~ | 393
~~................................................................................................................................................................~~ | 394
~~................................................................................................................................................................~~ | 395
~~either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall~~ | 396
~~redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after~~ | 397
~~discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near~~ | 398
~~open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she~~ | 399
~~then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall~~ | 400
~~continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this~~ | 401
~~Charter Party shall apply until redelivery.~~ | 402

33. <u>Ice</u> | 403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area | 404
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is | 405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and | 406
remain in the port or area or to get out after having completed loading or discharging. ~~Subject to the~~ | 407
~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her~~ | 408
~~size, construction and ice class.~~ | 409

34. <u>Requisition</u> | 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter | 411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid | 412
by the said government in respect of such requisition period shall be retained by the Owners. The period | 413
during which the Vessel is on requisition to the said government shall count as part of the period provided | 414
for in this Charter Party. | 415

~~If the period of requisition exceeds ....................................... months, either party shall have the option~~ | 416

~~of cancelling this Charter Party and no consequential claim may be made by either party.~~ 417

35. Stevedore Damage 418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all 419
damage to the Vessel caused by stevedores excluding normal wear and tear provided the Master has 420
notified the party responsible and Charterers and/or their
agents in writing as soon as practical but not later than 48 hours after any damage is discovered.  Such 421
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent 422
of such damage.  The Master to notify stevedores of the damage as soon as it is discovered and 423
endeavour to obtain their written acknowledgement of, and liability for, the damage and whenever
to get the stevedores to repair the damage.

(a)  In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew 424
and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs 425
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed 426
and if required passed by the Vessel's classification society. 427

(b)  Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, 428
before or after redelivery concurrently with the Owners' work.  In such case no hire and/or expenses will 429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for 430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the 431
Owners' work. 432

36. Cleaning of Holds 433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~ 434
~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~ 435
~~local regulations, at the rate of .......................................... per hold.~~ 436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~ 437
~~accepted or passed by the port or any other authority.~~  The Charterers shall have the option to re-deliver 438
the Vessel with unclean/unswept holds against a lumpsum payment of US 5,000 lumpsum in lieu of cleaning. 439

37. Taxes 440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners 441
resulting form the Charterers' orders herein, whether assessed during or after the currency of this Charter 442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding 443
taxes levied by the country of the flag of the Vessel or the Owners). 444

38. Charterers' Colors 445

The Charterers shall have the privilege of flying their own hours flag and painting the Vessel funnel with their 446

own markings. ~~The Vessel shall be repainted in the Owners' colors before termination of the Charter~~ 447
~~Party.~~ Cost and time of painting, maintaining and repainting those changes effected by the Charterers 448
shall be for the Charterers' account. See also Clause 83. 449

39. Laid Up Returns 450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days if on full hire for this period or pro rata for the time actually on hire. 453

40. Documentation 454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. 459

~~41. Stowaways~~ 460

~~(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining~~ 461
~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~ 462
~~Charterers.~~ 463

~~(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained~~ 464
~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~ 465
~~Charterers, this shall amount to breach of charter for the consequences of which the Charterers~~ 466
~~shall be liable and shall hold the Owners harmless and shall keep them indemnified against all~~ 467
~~claims whatsoever which may arise and be made against them. Furthermore, all time lost and all~~ 468
~~expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account~~ 469
~~and the Vessel shall remain on hire.~~ 470

~~(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to~~ 471
~~sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a~~ 472
~~reasonable time, the Vessel is released and at their expense put up bail to secure release of the~~ 473
~~Vessel.~~ 474

~~(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained~~ 475
~~access to the Vessel by means other than secreting away in the goods and/or containers shipped~~ 476
~~by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including~~ 477
~~fines, shall be for the Owners' account and the Vessel shall be off hire.~~ 478

~~(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel~~ 479
~~by means other than secreting away in the goods and/or containers shipped by the Charterers,~~ 480

the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel          481
is released and at their expense put up bail to secure release of the Vessel.          482

42.    Smuggling          483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any          484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.          485
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account
if caused by Charterers, their supercargo and/or their staff or agents.

43.    Commissions          486

A commission of ......1.25............................... percent is payable by the Vessel and the Owners to          487
Prime Maritime Inc. ........................................................................          488
........................................................................          489
........................................................................          490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.          491

44.    Address Commission          492

An address commission of ......3.75............. percent is payable to Charterers............................          493
........................................................................          494
........................................................................          495
........................................... on hire earned and paid under this Charter.          496

45.    Arbitration          497

(a)    NEW YORK          498
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and          499
subject to U.S. Law.          500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their          501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this          502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with          503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of          504
Maritime Arbitrators Inc.          505

For disputes where the total amount claimed by either party does not exceed US $............................ **          506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society          507
of Maritime Arbitrators Inc.          508

(b)    LONDON          509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree          510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business          511

| | |
|---|---|
| in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, | 512 |
| one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire.  No | 513 |
| award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as | 514 |
| above, unless objection to his action be taken before the award is made.  Any dispute arising hereunder | 515 |
| shall be governed by English Law. | 516 |

For disputes where the total amount claimed by either party does not exceed US $50,000, **        517
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime        518
Arbitrators Association.        519

\*   Delete para (a) or (b) as appropriate        520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions        521
of this clause shall full force and remain in effect.        522

If mutually agreed, clauses ...46...... to .....91......., both inclusive, as attached hereto are fully        523
incorporated in this Charter Party.        524

APPENDIX "A"                                                    525

To Charter Party dated ..................................................................... 526

Between ........................................................................... Owners) 527

and ............................................................................... Charterers 528

Further details of the Vessel:                                  529
                                                                530

OWNERS:                          CHARTERERS:

                

1ˢᵀ ORIGINAL



ADDITIONAL CLAUSES TO M/V. "ANGELIKI D"/ NAVI-TREK
CHARTER PARTY DATED 27TH SEPTEMBER 2004

46. Boycott/Blacklist
Should the vessel be boycotted, blacklisted or similar incident at any port place by the shore and/or port labour and/or the tug boats and/or the pilots, or by the government and/or any authority, by reason of vessel's flag or the terms and conditions of which members of the Officers/Crew were employed or by reason of other vessel" under the same ownership, management, operation or control or by reason of vessel's construction and/or her cargo gear and/or her fittings and/or her other equipment, all consequences and extra expenses incurred therefrom to be for Owners' account and Charterers are entitled to put the vessel 'off hire' for any time lost by such reason.  If boycott, blacklisting or other similar incident is caused by the actions and/or neglect and/or default of the Charterers, their servants and/or their agents then this Clause shall be inoperative.

47. Oil Pollution
Charterers shall be under no responsibility for oil or other pollution damage (including loss or time) and Owners shall indemnify Charterers harmless against all consequences (including fines if any imposed on Charterers) of oil or other pollution damage only in case the oil or other pollution damage caused by the vessel.

48. Panama/Suez Canal Transit
Vessel is fully fitted by panama/Suez Canal transit and is in possession of necessary certificate(s) on board, in conformity with current Canal regulation/requirements.

49. Blacklist
Owners warrant to the best of their knowledge that neither this vessel nor any other vessel under ownership/management/control has ever called at an Israeli port and will not call at any such port prior to or during the currency of this Charter.  Owners also warrant to the best of their knowledge that neither this vessel nor any other vessel under this Ownership/management/control is blacklisted by any Arab countries.

50. Derat Certificates
Vessel to be delivered with valid dexatisation or deratisation exemption certificate on board, and if this does not cover the whole period of this Charter and renewal of certificate is necessary, cost of and delay of vessel and any directly/proven expenses incurred there from to be for Owners' account, unless caused by ports called or cargoes carried under this Charter Party.

51. Quarantine
Normal quarantine time and expenses to enter the port to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness, etc. of Master, officers and crew to be for Owners' account, unless caused by ports called or cargoes carried under this Charter Party.



Prima Maritime Inc.

1

1ST ORIGINAL

### ADDITIONAL CLAUSES TO M/V. "ANGELIKI D"/ NAVI-TREK CHARTER PARTY DATED 27TH SEPTEMBER 2004

52. <u>Vaccinations</u>
Owners to arrange at their expenses that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fewer, choleras or other necessary health certificates during the Charter.

53. <u>Cargo Stowage</u>
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo, and Master to make best efforts to collect, restow, and provide any useful dunnage, lashings etc., including pre-slings/wire slings all of which shall be supplied by Charterers, not broken for next use after completion of the voyage, during the currency of this Charter, if requested to do so by Charterers.

54. <u>Opening/Closing Hatches</u>
All openings/closing of hatches to be performed by crew provided shore regulations permit.

55. <u>Gangway Watchman</u>
Gangway Watchman to be for Owners' account, unless gangway watchmen are compulsory, in which case gangway watchman to be for Charterers' account.

56. <u>Owners Agents</u>
Charterers to agree Owners to use Charterers' agent for attending minor matters such as crew mail/cash advance/fresh water supply for crew members/crew medical care etc., for which Owners to pay actual expenses. If such services are included in regular agency fee there will be no charge to Owners, however if agents charge additional fee for Owners matters, then such fee to be for Owners' account.

57. <u>Disbursement Deductions</u>
Charterers shall have the liberty to deduct from hire payment maximum US$250 per port disbursed for Owners' account supported by vouchers. Unless mutually agreed.

58. <u>Detention of Vessel</u>
Should vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any act or omission or default of Charterers or their agents. Any extra expense incurred by and/or during above seizure or detention such expenses to be for Charterers' account and the vessel to remain fully on-hire.

59. <u>War Risk Insurance</u>
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery including trapping sod blocking insurance and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The order of Owners' war risk Underwriters always to be followed. Owners War Risk Underwriters are:
<u>Prime Maritime Inc.</u>

p. 1

RECOMMENDED
THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE
UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)
INCLUDING "F.IO." ALTERNATIVE, ETC.
(To be used for trades for which no specially approved form is in force)
CODE NAME "GENCON"

1ST ORIGINAL

Part I

| | |
|---|---|
| 1. Shipbroker<br><br>INTER-ASIA MARINE TRANSPORT INC.<br>Manila | 2. Place and date<br><br>Manila    29th SEPTEMBER 2004 |
| 3. Owners/Place of business (Cl. 1)<br><br>Disponent Owners<br>NAVI-TREK INC., Houston, Texas USA | 4. Charterers/Place of business (Cl. 1)<br><br>PHILIPPINE PLANTERS CONSUMERS<br>INC., Manila |
| 5. Vessel's name (Cl. 1)  MV "ANGELIKI D" | 6. GRT/NT (Cl. 1)   20,905 / 13,320 |
| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1)<br><br>37,428 METRIC TONS ALL TOLD | 8. Present position (Cl. 1)<br><br>SPOT RIZHAO |
| 9. Expected ready to load (abt.) (Cl. 1)<br>laydays commencing  28th SEPTEMBER 2004 | 10. Loading port or place (Cl. 1)<br>1 SAFE BERTH QINHUANGDAO<br>CHARTERERS' OPTION SECOND LOADPORT<br>1 SAFE BERTH LONGKOU | 11. Discharging port or place (Cl. 1)<br><br>1 SAFE BERTH PORO POINT |

12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)

MINIMUM 25,000 / MAXIMUM 27,000 METRIC TONS IN OWNERS' OPTION
BULK UREA (STOWAGE FACTOR ABOUT 1.55 CBM PER TON WITHOUT GUARANTEE)

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment, also beneficiary and bank account) (Cl. 4) |
|---|---|
| US$ ████ PER MT FIOST BASIS 1/1<br>US$ ████ PER MT FIOST EXTRA ON ENTIRE CARGO<br>IF SECOND LOADPORT LONGKOU USED | SEE CLAUSE 4 |

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless) | 16. Laytime (if separate laytime for load and disch. is agreed, fill in a) and b). If total laytime for load and disch., fill in c) only) (Cl. 6) |
|---|---|
| See Clauses 5.1(b), 19 | a) Laytime for loading      See Clause 21 |
| 17. Shippers (state name and address) (Cl. 5) | b) Laytime for discharging   See Clause 22 |
| | c) Total laytime for loading and discharging |
| 18. Demurrage rate and disbursements (Cl. 7)<br>US$ ████ per day/pro rata (DLTS) | 19. Cancelling date (Cl. 10)   2 OCTOBER 2004 |

20. Brokerage commission and to whom payable (Cl. 14)
1.25% address commission payable to Charterers and 1.25%
brokerage to Inter-Asia Marine Transport Inc, Manila, and 1.25% to Downing Shipping Pte. Ltd., Singapore

21. Additional clauses covering special provisions, if agreed.

Rider Clauses 18 – 51, inclusive, as herewith attached,

to be considered as integral part of this Charter Party.

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I to the extent of such conflict shall prevail over those of Part II to the extent of such conflict.

| Disponent Owners NAVI-TREK INC.<br>Houston, TX USA | PHILIPPINE PLANTERS CONSUMERS INC.<br>Manila |
|---|---|
| Signature (Owners) | Signature (Charterers) |

Printed and sold by S. Sadler & Co. Ltd., 39 Tooley Street, SE1 2TN  Tel 071 407 9177  Tlx 24665  Fax 071 403 1733 by authority of The Baltic and International Maritime Conference, Copenhagen.

Annex 2



EXHIBIT
B

P. 2



**PART II**

**'Gencon' Charter (As Revised 1922 and 1976)**

**1ST ORIGINAL**

---

**Bill of Lading**

**Having book**

**Owners' Responsibility Clause**

**Deviation Clause**

**Payment of Freight**   | SEE CLAUSE 41 |

**Loading/Discharging**

**Laytime**

except during excepted periods

| SEE CLAUSE 39 |

**Demurrage**   | to be paid by Charterers |

---

**Lien Clause**

**Bills of Lading**   | or Agents |

**Cancelling Clause**

**General Average**   1994   | in London; English Law to apply |

**Indemnity**

**Agency**   | SEE CLAUSE 44 |

**Brokerage**   | deadfreight; demurrage and detention. |

**GENERAL STRIKE CLAUSE**

PART II

"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.



1st ORIGINAL

**Additional Clauses**

# M.V. "ANGELIKI D"

## (CHARTER PARTY DATED 29 SEPTEMBER 2004)

18. Vessel's holds to be clean and dry and in all respects fit to receive bulk urea to Shippers' surveyor's satisfaction and without trace of previous cargo. If vessel fails hold inspection and extra cleaning/drying is required same for Owners' account and time until such time as holds are passed. Dunnage, mats and kraft paper, if required by Owners/vessel Master to be for Owners' account.

19. Cargo to be loaded and trimmed free of expenses to the vessel by Charterers. Likewise, cargo to be discharged free of expenses for the vessel by Receivers engaging their own stevedores at discharging port.

20. Owners to release cargo against Charterers' Letter of Indemnity if original Bills of Lading not available at discharge port in Owners' format.

21. Cargo to be loaded on CQD basis. Detention US$▓▓▓▓▓ per day or pro rata in case cargo/cargo documents not ready on vessel tendering Notice of Readiness.

22. Cargo to be discharged at discharging port at the rate of 2000 metric tons per weather working day. Time from 1200 hours Saturday or day before a holiday until 0800 hours Monday or day after a holiday not to count unless used, if used only time actually used to count as laytime.

23. If despatch at discharge port, Owners to pay despatch money to Charterers at the rate of U.S. Dollars ▓▓▓▓ per day or pro rata for part of a day for laytime saved.

    All Bills of Lading issued under this Charter Party to incorporate the terms and conditions of Charter Party dated 29 September 2004.

25. All ship's certificates must be valid, otherwise, any delay due to renewal to be for Owners' account. Vessel to have all international safety and trading documents valid for the duration of the charter. If loading or discharging is delayed due to non-validity of ship's documents, such delay will be for Owners' account.

26. At load and discharge ports, opening and closing of hatches to be done by vessel's crew if permitted by local regulations otherwise shore labour to be employed at Charterers' expense. Time used for same to be for Charterers' account.

27. All cargo compartments to be clear space without stanchions or other obstacles. Vessel not to load in deeptanks or any other compartments which are inaccessible.

28. Any dues/taxes on cargo, if any, for Charterers' account, on vessel/freight for Owners' account.

29. Owners to undertake to maintain the vessel's loading and discharging gear in efficient working order and to give Charterers the privilege of working all hatches and holds at ports of loading and discharging at any time. Vessel to give free use of cargo gear, winches and derricks capable of lifting capacity as per description clause and sufficient power to drive them day and night. Vessel to supply all necessary lights as on board for any work free of expenses to Charterers, also for night work and Fridays/Sundays and holidays when required. Any delay in loading and discharging due to inefficiency or breakdown of cranes not to count pro rata as laytime to be for Owners account. In case of crane breakdown, Charterers/Shippers/Receivers have liberty to employ shore gear, charges for Owners' account, in which case time shall count continuously but the cost of using shore gear must be discussed/approved with Owners prior to order.

30. Port charges quay/berth and harbour dues, weight and tonnage dues and similar dues on ship according to port tariff to be for owners' account.

31. Owners guarantee the vessel is not blacklisted by Chinese or Philippine authorities, however, should vessel be found to be blacklisted upon arrival at loading port, Owners to bear all consequences and/or damages without any responsibility to Charterers or Shippers.

32. At discharging port(s) if Master requires cash advance, provisions, bunkers, medical attendance, transfer of crew etc he should request Owners for separate remittance.

33. Vessel to notify agent 3/2/1 days notice of ETA loading port giving draft and tonnage required in each hatch. Similarly at discharging port Master to cable 3/2/1 days prior to arrival to Agents giving ETA, draft.

34. First shifting from anchorage to berth to be for Owners' account and time not to count unless vessel is on demurrage in which case all time to count as time on demurrage.

- 2 -

MV "ANGELIKI D"
CP 29 September 2004

35. All disputes, controversies or differences which may arise between the parties out of or in relation to or in connection with this contract or for the breach therefore shall be finally settled in Singapore by English Law. The award rendered by arbitrator(s) shall be final and binding upon both concerned parties.

36. Both-to-Blame Collision clause, New Jason Clause, the Paramount clause, Chamber of Shipping War Risks clauses (1) and (2), Pollution clause and P&I Bunkering Deviation clause are deemed to be incorporated in this charter party.

37. This Charter Party shall not be binding on Charterers and Owners if performance is impossible because of force majeure including war, flooding, strikes, fire, act of God and government regulations.

38. Lighterage/lightening, if any, to be for Charterers' account, time and risk both ends.

39. Overtime charges to be account of the party ordering the same, but overtime for the officers and crew of the vessel to be for Owners' account.

40. Vessel to be left in seaworthy trim to the Captain's satisfaction.

41. 98 percent freight, less commissions, payable within three (3) banking days after completion of loading and signing/releasing Bills of Lading marked 'FREIGHT COLLECT' or 'FREIGHT PAYABLE AS PER CHARTER PARTY". Balance 2 percent freight payable along with demurrage/dispatch within 30 days after completion discharge and submission full laytime documents.

Freight deemed earned as cargo being loaded on board, discountless, non-returnable whether vessel and/or cargo lost or not lost. If "FREIGHT PREPAID" Bills of Lading required, then same to be released only against evidence of the irrevocable payment of 98 percent freight by Charterers into Owners' nominated account.

Freight to be paid by telegraphic transfer to Owners' nominated bank account as follows:



MV "ANGELIKI D"
CP 29 September 2004

42.  The stevedores although appointed by Charterers, Shippers or Receivers or their agents, to follow the direction of the Master.  Master to notify stevedores of damage.  If any, in writing within 24 hours after occurrence.

     Claims for stevedore damage, if any, to be settled between Owners and stevedores.  However, Charterers to lend all possible assistance to Owners in collecting any stevedore claims.

43.  Overage insurance premium if any for Charterers' account

44.  Charterer's nominated agents both ends, Owners paying customary disbursements.  Owners' agents at Longkou.

45.  Vessel's description (all details 'about') :

     MV "ANGELIKI D"
     BULK CARRIER - SELF TRIMMING
     BUILT HELLENIC SHIPYARD - GREECE - 1979
     PANAMA FLAG-ABS CLASS
     STRENGTHENED FOR HEAVY CARGOES NOS 2+4+6 HOLDS MAY BE EMPTY.
     DWAT / DRAFT: 37428 TNS DRAFT 11.37 METERS / TPC: 44.5
     VSL IS FITTED FOR TRANSIT: PANAMA, SUEZ CANALS
     GRT/NRT: 20905/13390
     SUEZ: 21710/17931
     PANAMA 22633/17496
     LOA/BEAM/DEPTH: 196.13/26.48/15.40 M
     7 HO/HA
     CARGO GEAR: (FIVE) 5 OF 20 TNS SWL, OUTREACH OF CRANES:  8.5 METERS
     HATCH COVERS : MACGREGOR SINGLE PULL TYPE
     HATCH DIMS NO.1+7=12.225 X 12.4M NO.2-6=13.04 X 12.4M
     GRAIN 1,645,298 CBM  / BALE 1,546,243 CFT INCL HATCH SPACE
     GRAIN BREAKDOWN NO.1 5540,8 NO.2 7078,8 NO.3 6911,3 NO.4 6859,4
     NO.5 6911,6 NO.6 6898,9 NO.7 6388,7 CBM

46.  Ships crew not to be used as winchmen or drivers of cargo gear.

47.  NOR to be tendered during office hours Monday/Friday 0900/1700 hours and Saturday  0900/1200 hours on working days only by written cable or telex or e-mail whether in port or not, whether in berth or not, whether Customs cleared or not, whether in free pratique or not.  Laytime to commence at discharging ports at 1300 hours if Notice of Readiness tendered during office hours before noon and at 0800 hours the next working day if Notice of Readiness tendered during office hours in the afternoon.

48.  Fixture to be kept strictly private and confidential.

                                                                    - 4 -

MV "ANGELIKI D"
CP 29 September 2004

49.    Charterers' option carry empty spare bags free of charge.

50.    Bills of Lading to be dated September 30th, if required, provided all cargo is ready for shipment, loading has already commenced on or before 30th September and against a Letter of Indemnity from buyer, charterers and receiver of the cargo.

51.    WAR CLAUSE (VOYWAR '93)

1)    For the purpose of this Clause, the words:

(a)    "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b)    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)    If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract or Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

- 8 -